(Not for publication)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

| | |
|---|---|
| NEKIESHA WILLIAMS, | : |
| | : |
| Plaintiff, | :  Civil No. 05-1805 (RBK) |
| | : |
| v. | :  **OPINION** |
| | : |
| TOWNSHIP OF WEST DEPTFORD, et al., | : |
| | : |
| Defendants. | : |
| | : |

**KUGLER**, United States District Judge:

This matter comes before the Court on a motion by Township of West Deptford, West Deptford Police Chief James P. Mehaffey, and Officers Patrick Goggin, Michael Pfeiffer, and Sean McKenna (collectively "Defendants") for summary judgment against Nekiesha Williams ("Plaintiff"). Plaintiff was arrested and suffered a broken leg during her encounter with Officers Goggin, Pfeiffer, and McKenna (collectively "Officer Defendants") while they were at Plaintiff's apartment complex to execute search warrants. For the reasons set forth below, the Court will grant Defendants' motion for summary judgment as to Plaintiff's claim of false arrest against Township of West Deptford and Chief Mehaffey and deny it in all other respects.

I.      **BACKGROUND**

A.      **Events of August 6, 2003**

During the evening of August 6, 2003, Plaintiff was at her home located in the Red Bank

1

Run Apartments in Woodbury, New Jersey.  Officers from the West Deptford Township Police

Department ("WDTPD") arrived at the Red Bank Run Apartments to execute two search

warrants related to suspected drug activity at Apartments C-3 and C-4 in the Red Bank Run

complex.  Just prior to the arrival of the police, Plaintiff's five-year-old daughter Tahja had been

riding her bicycle outside.  (Pls.' Stmt. of Facts ¶ 4.)  Out her window, Plaintiff observed the

police in the parking lot with their guns in their hands, and she went outside to get Tahja.  (Id. ¶

5.)  Plaintiff did not find Tahja outside, however, and asked her neighbor, Letita Harrell whether

she had seen Tahja.  (Id. ¶ 7.)  Ms. Harrell indicated that Tahja was inside Ms. Harrell's

apartment, C-3.  (Id. ¶ 9.)  At that point, Plaintiff testified that several police officers entered

Apartment C-3, and several other officers approached Ms. Harrell and her.  Police allegedly

threw Ms. Harrell to the ground and held a gun to her head.  (Id. ¶¶ 9-11.)

Plaintiff was frightened for Tahja's safety and implored Officer Goggin to allow her to

get Tahja out of the apartment.  Officer Goggin told her that she could not enter the apartment

due to the investigation that was underway.  (Id. ¶¶ 13-14.)  Plaintiff repeated her plea and started

to cry.  (Id. ¶ 14.)  Plaintiff then recalls that Officer Goggin and two other officers grabbed

her—one took her left arm, another her right arm, and the third seized her around her waist.  (Id.

¶ 19.)  Allegedly, the officers told her that she was under arrest for obstruction, and then the three

proceeded to lift her into the air and slam her onto the ground.  (Id. ¶ 20.)  Plaintiff testified that

she landed feet first and then fell into a sitting position.  (Id. ¶ 22.)  The impact with the ground

broke her femur, and Plaintiff was overcome by pain and could not move her leg.  (Id. ¶¶ 23-24,

35.)  A witness to the scene testified that she observed Plaintiff lying on the ground "whimpering

in pain."  (Id. ¶ 34.)

2

Officer Defendants' account of their encounter with Plaintiff differs significantly.  Officer Goggin testified that Plaintiff approached him while he was standing in the doorway to Apartment C-3 and screamed that she needed to get her "fucking baby" out of the apartment. (Defs.' Stmt. of Facts ¶ 8.)  Officer Goggin stated that he told Plaintiff that no one could enter or leave the apartment until the execution of the search warrant was completed, but that he offered to go inside Apartment C-3 and retrieve her daughter after the investigation was finished.  (Id. ¶¶ 9-10.)  Officers Goggin, McKenna, and Pfeiffer testified that Plaintiff continued yelling obscenities and screaming.  In response, Officer Goggin says he instructed Plaintiff to sit down in a nearby lawn chair.  (Id. ¶ 12.)  According to Officer Goggin, Plaintiff initially complied, but then jumped up and pushed him with both hands on his face.  (Id.)  Following the initial push, Officer Goggin testified that Plaintiff started swinging her arms at him and that she struck him twice on the left side of his jaw.  (Id. ¶ 13.)  Officer Goggin stated that as a result, he told Plaintiff that she was under arrest; however, Plaintiff continued to flail her arms and did not comply with his demand to cease resisting.  (Id. ¶¶ 14-15.)  Then Officer Pfeiffer intervened to assist Officer Goggin in trying to gain control of Plaintiff.  (Id. ¶ 17.)  Officer Pfeiffer testified that he succeeded in pinning Plaintiff's left arm against her body, but Plaintiff continued to flail her right arm.  (Id. ¶ 18.)

Officer Pfeiffer testified further that he made the decision to take Plaintiff "to the ground" to handcuff her.  In so doing, Officer Pfeiffer stated that he wrapped his left arm around her left side and his right arm around her waist and then used his body weight to leverage her to the ground.  (Id. ¶ 21.)  Officers Pfeiffer and Goggin allegedly fell with Plaintiff.  Officer Pfeiffer recounted that even once on the ground, Plaintiff continued to resist the officers handcuffing her.

3

(Id. ¶¶ 22-23.)  Defendants maintain that only once Plaintiff was on the ground did Sergeant McKenna become involved with her, aiding Officers Goggin and Pfeiffer in placing handcuffs on her.  (Id. ¶¶ 24-25.)

Plaintiff was eventually transported to the hospital where she underwent surgery on her broken femur the following day.  (Pl.'s Stmt. of Facts. ¶ 43.)  She remained hospitalized for ten days.  (Id.)

### B.    Prosecution of Plaintiff

Plaintiff was charged with aggravated assault, simple assault, obstructing administration of law, and resisting arrest as a result of her encounter with Officer Defendants.  (Id. ¶ 47.)  On March 15, 2005, Plaintiff entered the Pretrial Intervention Program ("PTI Program") by signing a consent order, which stated that her acceptance into the program was "without trial or admission of any issue of law or fact regarding the charges of aggravated assault, attempting to prevent a public servant from lawfully performing an official function and effecting a lawful arrest."  (See Pl.'s Mot. Summ. J. Ex. G.)  Following the entry of the consent order on the record and after Plaintiff walked away from her criminal defense attorney, the prosecutor asked her attorney to stipulate that Officer Defendants had probable cause to arrest Plaintiff on August 6, 2003.  (Id. Exs. H, I.)  Plaintiff's attorney agreed and initialed his consent where the prosecutor had hand written "Defendant stipulates that there was probable cause for her arrest on this case."  (Id. Ex. I.)  Plaintiff's attorney agreed to the addition without discussing or receiving Plaintiff's permission.  (Id. Ex. H.)  The indictment against Plaintiff was resolved when she successfully completed the PTI Program in December 2005.

4

### C.    Procedural History

On October 20, 2003, Plaintiff filed a notice of claim with the Township of West Deptford alleging that Officers Goggin, Pfeiffer, and a third as yet unidentified officer had arrested her without probable cause and had used excessive force in carrying out the arrest.  (Pl.'s Stmt. of Facts ¶¶ 48-49.)  Plaintiff filed her Complaint with this Court on April 1, 2005.  On August 26, 2005, she amended her Complaint, adding as defendants the County of Gloucester and Prosecutor Sean Dalton.  On October 17, 2007, however, Plaintiff voluntarily dismissed those two defendants from the case.  The remaining defendants filed their motion for summary judgment on October 10, 2007, and Plaintiff opposes the motion.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986).  A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could find for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  When the Court weighs the evidence presented by the parties, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."  Id. at 255.

The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment.  Celotex, 477 U.S. at 330.  The moving party may satisfy this burden by either (1) submitting affirmative evidence that negates an essential element of the nonmoving party's claim; or (2) demonstrating to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's case.  Id. at 331.

5

Once the moving party satisfies this initial burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). To do so, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Rather, to survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

## III.   ANALYSIS

Pursuant to 42 U.S.C. § 1983, Plaintiff alleges that Officer Defendants violated her Fourth Amendment rights to be free from excessive force during a seizure and to be free from false arrest and imprisonment. Plaintiff alleges further that Township of West Deptford and Chief Mehaffey are also liable for those violations. In addition, Plaintiff contends that Officers Goggin, Pfeiffer, and McKenna committed assault and battery. Plaintiff also originally advanced a claim for abuse of process and for harassment by Officer Defendants; however, Plaintiff withdrew those claims in her opposition to Defendants' summary judgment motion.

### A.   Fourth Amendment Claims

Individual Defendants assert that they are immune from Plaintiff's § 1983 claims under the doctrine of qualified immunity. Section 1983 provides a remedy for acts that violate the United States Constitution committed by a person acting under color of state law. Government officials who are accused of violating a person's constitutional rights while performing discretionary functions, however, are entitled to qualified immunity.

Qualified immunity protects police officers, like other governmental officials, from

6

liability for civil damages where their conduct in performing a discretionary function "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Orsatti v. New Jersey State Police, 71 F.3d 480, 483 (3d Cir. 1995) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Qualified immunity provides government officials room for mistakes in judgment and protects "all but the plainly incompetent or those who knowingly violate the law." Orsatti, 71 F.3d at 484. The rationale behind qualified immunity for police officers is to permit officers to perform their duties "without the fear of constantly defending themselves against insubstantial claims for damages" and to allow the public to recover damages where officers "unreasonably invade or violate individual rights under the Constitution and the laws of the United States." Id. at 483 (citing Anderson v. Creighton, 483 U.S. 635, 639 (1987)).

The qualified immunity analysis is two-fold. First, the court is to assess whether the facts as alleged by the plaintiff amount to a constitutional violation. If this test is met, the court then determines whether the right is "clearly established." Saucier v. Katz, 533 U.S. 194, 200-01 (2001); Kopec v. Tate, 361 F.3d 772, 775-76 (3d Cir. 2004). Accordingly, the Court will consider whether Officer Defendants are entitled to summary judgment on any of Plaintiff's constitutional claims based on qualified immunity.

### i.   Excessive Force

The Fourth Amendment prohibits a police officer from seizing a citizen except on probable cause. Albright v. Oliver, 510 U.S. 266, 274-75 (1994). The Fourth Amendment's objective reasonableness standard controls where a police officer allegedly uses excessive force during an arrest. Graham v. Connor, 490 U.S. 386, 397 (1989). To establish a claim for

7

excessive force as an unreasonable seizure, a plaintiff must show that a seizure occurred and that the seizure was unreasonable.  Rivas v. City of Passaic, 365 F.3d 188, 198 (3d Cir. 2004) (citing Curley v. Clem, 298 F.3d 271, 279 (3d Cir. 2002)).  Proper application of this objective reasonableness standard "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  Saucier, 533 U.S. at 205.  Ultimately, "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  Here, it is agreed that a seizure occurred, so the remaining question concerns the reasonableness of that seizure.

At the summary judgment stage, a court must "consider only those facts alleged by [the plaintiff], taken in the light most favorable to him."  Rivas, 365 F.3d at 199.  Thus, "a police officer who is accused of having used excessive force is not precluded from arguing that he reasonably perceived the facts to be different from those alleged by the plaintiff, but that contention . . . must be considered at trial."  Id. (citation and internal quotation marks omitted).

The facts to which Plaintiff testified are sufficient to support a triable claim of excessive force.  Plaintiff stated that in response to her pleas to be allowed to get her daughter, she was placed under arrest, picked up in the air, slammed onto the ground, and handcuffed.  Accepting this evidence, Plaintiff had not committed any crime.  Furthermore, in light of these facts, a jury could reasonably conclude that Plaintiff, who is 5 feet 5 inches tall and weighs 180 pounds, did not pose an immediate threat to the safety of the three officers.  Defendants do not argue that she posed a threat to the safety of anyone else.  There is no suggestion that Officer Defendants

8

believed Plaintiff to be armed at the time she approached them, and Plaintiff was the only person they needed to contend with at the time, because police had already seized the only other person in the area, Letita Harrell.  Defendants assert that Plaintiff resisted arrest by flailing her arms and that she continued to resist even when on the ground by concealing her hands under her body; however, at this stage, the Court must accept Plaintiff's testimony that she did not resist.

In addition, the precise nature of the Officer Defendants' actions is disputed.  Defendants maintain that Officer Goggin was struggling to gain control over Plaintiff when Officer Pfeiffer intervened, wrapped his left arm around her left side, his right arm around her waist, and then used his body weight to leverage her to the ground, at which point both he and Officer Goggin fell to the ground with Plaintiff.  Plaintiff contends that Officers Goggin, Pfeiffer, and a third officer, presumably Officer McKenna, lifted her in the air and threw her on the ground.[1]  Indeed, Plaintiff bolsters her testimony with expert opinion.  Timothy Kremcheck, M.D. indicates that a fracture of the femoral shaft, like Plaintiff's, typically results from a "catastrophic event," like "motor vehicle accidents, auto pedestrian accidents, gun shot injuries, [and] falls from great heights."  (Pl.'s Mot. Summ. J. Ex. F.)  Dr. Kremcheck states that it would take a significant amount of force to break the femur of a healthy young woman like Plaintiff.  He opined that "her injury came from a significant fall or trauma that was not a typical fall."  (Id.)  In response to this evidence, Defendants merely impugn Plaintiff's credibility; they fail to offer any evidence to

_____

[1] Defendants argue that Officer McKenna should get summary judgment on Plaintiff's excessive force claim because he did not participate in forcing Plaintiff to the ground and only intervened to place handcuffs on her.  Plaintiff, however, testified that three officers picked her up and threw her to the ground, and it is undisputed that Officer McKenna was the third officer involved in Plaintiff's arrest.  This Court is bound to accept Plaintiff's testimony for purposes of summary judgment, and therefore Officer McKenna is not entitled to summary judgment.

rebut Plaintiff's explanation of how she fractured "the longest and strongest bone in the human body."  (See id.)  The facts presented by Plaintiff, if true, rise to the level of constitutionally impermissible excessive force, and therefore Plaintiff satisfies the first part of the qualified immunity analysis.

Since Plaintiff has alleged sufficient facts to make out a claim of excessive force in violation of her Fourth Amendment rights, this Court must progress to the second prong of the qualified immunity analysis and determine whether the rights were clearly established.  The Supreme Court has determined that such a finding hinges on "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  Saucier, 533 U.S. at 202.  This Court concludes that it would have been clear to a reasonable police officer that three male officers lifting a woman in the air and throwing her on the ground with force sufficient to break a femur bone is unreasonable where that individual is alone, unarmed, outnumbered by police eight to one.  According to Plaintiff, her conduct was nonthreatening, since though upset, she was merely expressing her desire to retrieve her daughter.  Consequently, Officer Defendants are not entitled to qualified immunity on Plaintiff's claim of excessive force. In addition, a reasonable jury could conclude, based on the evidence set forth above, that Officer Defendants' actions were not objectively reasonable in light of the facts and circumstances confronting them.  As a result, Plaintiff's excessive force claim will survive summary judgment.

### ii.    False Arrest

Defendants argue that Officer Defendants had probable cause to arrest Plaintiff for aggravated assault, obstruction of justice, and resisting arrest.  They argue further that Plaintiff stipulated that probable cause existed for her arrest when her criminal defense attorney initialed a

handwritten change to the typed order admitting her into the PTI Program.  Plaintiff disputes that there was probable cause to arrest her, and she contends that the consent order to which she agreed stated that she was not admitting "any issue of law or fact regarding the charges of aggravated assault, attempting to prevent a public servant from lawfully performing an official function and effecting a lawful arrest."  (See Pl.'s Mot. Summ. J. Ex. H.)  Plaintiff avers that she never consented to the modification of the order by her attorney.  (See id.)

It is well-established in the Third Circuit that an arrest without probable cause is a Fourth Amendment violation actionable under § 1983.  See Walmsley v. City of Phila., 872 F.2d 546 (3d Cir. 1989) (citations omitted).  To state a Fourth Amendment claim for false arrest, a plaintiff must allege two elements: (1) that there was an arrest; and (2) that the arrest was made without probable cause.  See Dowling v. City of Phila., 855 F.2d 136, 141 (3d Cir. 1988).  To establish the absence of probable cause, a plaintiff must show "that at the time when the defendant put the proceedings in motion the circumstances were such as not to warrant an ordinary prudent individual in believing that an offense had been committed."  Lind v. Schmid, 337 A.2d 365, 368 (N.J. 1975).  "Probable cause . . . requires more than mere suspicion; however, it does not require that the officer have evidence to prove guilt beyond a reasonable doubt."  Orsatti, 71 F.3d at 482-83.  Rather, probable cause exists when the facts and circumstances are "sufficient to warrant a prudent man in believing that the defendant had committed or was committing an offense."  Gerstein v. Pugh, 420 U.S. 103, 111 (1975) (quoting Beck v. State of Ohio, 379 U.S. 89, 91 (1964)).  Generally, the existence of probable cause is a factual issue.  Grohman v. Twp. of Manalapan, 47 F.3d 628, 635 (3d Cir. 1995) (citation omitted).

a.      *Collateral Estoppel*

Defendants argue that Plaintiff should be estopped from asserting that Officer Defendants lacked probable cause to arrest her because her criminal defense attorney had apparent authority to bind her to the added language in the order.  Plaintiff disputes that her attorney was acting with apparent authority and maintains that she did not consent to the admission of probable cause. Regardless of whether or not Plaintiff's attorney acted with apparent authority, however, collateral estoppel will not bar Plaintiff's assertion of her false arrest claim in this case.

Section 28 U.S.C. § 1738 generally requires "federal courts to give preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerged would do so."  Haring v. Prosise, 462 U.S. 306, 313 (1983).  Under New Jersey law, collateral estoppel may apply if the party asserting the bar demonstrates that: (1) the issue to be precluded is identical to the issue decided in the first proceeding; (2) the issue was actually litigated in the prior action, that is, there was a full and fair opportunity to litigate the issue in the prior proceeding; (3) a final judgment on the merits was issued in the prior proceeding; (4) determination of the issue was essential to the prior judgment; and (5) the party against whom issue preclusion is asserted was a party to or in privity with a party to the prior proceeding.  In re Estate of Dawson, 641 A.2d 1026, 1034-35 (N.J. 1994); Pivnick v. Beck, 741 A.2d 655, 661 (N.J. Super. Ct. App. Div. 1999), aff'd, 741 A.2d 655 (2000).  Moreover, because collateral estoppel is an equitable doctrine, it should only be applied when fairness requires.  Id.

While the issue of probable cause is the same in both cases, questions of fact exist regarding whether that issue was actually "decided" in the prior proceeding.  Plaintiff avers that the consent order she signed did not contain the handwritten statement and that she had no

knowledge of the addition.  (See Pl.'s Mot. Summ. J. Ex. H ¶¶ 5, 9.) Whether the issue of

probable cause was determined in the prior proceeding is a question of fact relating to whether

Plaintiff's attorney possessed apparent authority to bind Plaintiff to the handwritten addition in

the order.  Likewise, the evidence suggests that the issue of probable cause was not subject to a

"full and fair opportunity to litigate," as the probable cause stipulation appears to have been an

afterthought by the prosecutor following the court proceeding.  (See id. Ex. I ¶ 5.)  Weighing in

favor of estoppel, the consent order does qualify as a final judgment on the merits in Plaintiff's

criminal proceeding, see Interdynamics, Inc. v. Firma Wolf, 653 F.2d 93, 96-97 (3d Cir. 1981),

and Plaintiff was a party to the prior proceeding.

    Critically, however, the determination of probable cause was not essential to the

judgment in Plaintiff's criminal case.  The order permitting Plaintiff's entry into the PTI

Program, as it was entered, explicitly disclaimed any admission of issues of law or fact regarding

the charges against Plaintiff.  (See Pl.'s Ex. I ¶ G.)  See also Pressler, N.J. Court Rules, R. 3:28

Guideline 4 ("Enrollment in PTI programs should be conditioned upon neither informal

admission nor entry of a plea of guilt.  Enrollment of defendants who maintain their innocence

should be permitted . . . .").  Furthermore, there is no evidence that the question of probable

cause had any bearing on the subsequent dismissal of the charges against Plaintiff upon her

completion of the PTI Program.  Consequently, even if Plaintiff's attorney had apparent authority

and therefore bound Plaintiff to an admission of probable cause, Defendants have not established

all of the elements necessary to demonstrate that equitable estoppel is warranted.  Because

Plaintiff is not collaterally estopped from advancing her claim that Officer Defendants lacked

probable cause, the Court will proceed to examine whether Officer Defendants are entitled to

qualified immunity and therefore summary judgment.

### b.    *Aggravated Assault*

Under New Jersey law, a person is guilty of aggravated assault if she commits simple assault on "[a]ny law enforcement officer acting in the performance of his duties while in uniform or exhibiting evidence of his authority or because of his status as a law enforcement officer." N.J. Stat. Ann § 2C:12-1(b)(5)(a).  Simple assault occurs when a person "[a]ttempts to cause or purposely, knowingly or recklessly causes bodily injury to another[,] . . . [n]egligently causes bodily injury to another with a deadly weapon," or "[a]ttempts by physical menace to put another in fear of imminent serious bodily injury." N.J. Stat. Ann § 2C:12-1(a).

Plaintiff has set forth facts sufficient to make out a claim that Officer Defendants did not have probable cause to arrest her for aggravated assault.  Viewing the evidence in Plaintiff's favor, she merely pleaded with Officer Goggin to let her get her daughter; she testified that she did not strike him or threaten to strike him.  Thus, Plaintiff has made a factual showing that the circumstances were such that an ordinary prudent officer would not have believed that Plaintiff committed aggravated assault on Officer Goggin.  Moreover, the right to be free from false arrest in these circumstances is clearly established by the law.  Accordingly, Officer Defendants are not immune from Plaintiff's claim based on her arrest for aggravated assault.

### c.    *Resisting Arrest*

A person is guilty of the third degree offense of resisting arrest if she "purposely prevents a law enforcement officer from effecting an arrest" and either "(a) [u]ses or threatens to use physical force or violence against the law enforcement officer or another; or (b) [u]ses any other means to create a substantial risk of causing physical injury to the public servant or another."

N.J. Stat. Ann. § 2C:29-2(a).  Plaintiff testified once Defendant Officers told her she was under arrest, she did nothing to resist them.  She also testified that no one attempted to handcuff her before throwing her to the ground (Pl.'s Stmt. of Facts ¶ 14), and that once she landed on the ground in a seated position, an officer simply placed handcuffs on her.  A witness testified similarly that after Plaintiff was on the ground, she was not resisting but was simply whimpering in pain.  (Id.)  Plaintiff's account of events sets forth a claim for a deprivation of her Fourth Amendment rights with respect to her arrest for resisting arrest.  In addition, it is clearly established under the law that arresting a person for resisting arrest is unlawful where the individual has manifested no resistance.  As a result, Defendant Officers are not entitled to qualified immunity for arresting Plaintiff for resisting arrest.

Moreover, by crediting the evidence offered by Plaintiff, a reasonable jury could find that an ordinary prudent officer would not have believed that Plaintiff was resisting arrest.  Plaintiff asserts that she did not purposely prevent the police from effecting an arrest, and as such, a jury could reasonably conclude that Defendant Officers lacked probable cause to arrest her for resisting arrest.  Thus, Defendant Officers are not entitled to summary judgment on this claim either.

### d.  *Obstructing Justice*

A person obstructs justice where she "purposely obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from lawfully performing an official function by means of flight, intimidation, force, violence, or physical interference or obstacle, or by means of any independently unlawful act." N.J. Stat. Ann. § 2C:29-1(a).  This statute requires an interference by physical means.  State v.

15

<u>Camillo</u>, 887 A.2d 1151, 155-56 (N.J. Super. Ct. App. Div. 2005).

Plaintiff has alleged facts that Defendant Officers lacked probable cause to arrest her for obstructing justice, which rises to the level of a Fourth Amendment violation.  Defendants base their assertion that they had probable cause to arrest on Plaintiff's alleged acts of hitting Officer Goggin.  Accepting Plaintiff's testimony, however, a reasonable jury could find that she did not hit Goggin, and thus, she did not use flight, intimidation, force, violence, or physical interference or obstacle during her exchange with Defendant Officers.  If the jury believes that she never struck Officer Goggin, then there is no evidence to support that a reasonable officer would have believed he had probable cause to arrest Plaintiff for obstructing justice.  Furthermore, it would have been clear to a reasonable officer that arresting someone for obstructing justice was unlawful where the police lack probable cause.  As a result, Defendant Officers do not merit qualified immunity for arresting Plaintiff for obstructing justice.  In addition, since Plaintiff has produced evidence creating genuine issues of material fact concerning whether Defendant Officers had probable cause to arrest her on any grounds, they are not entitled to summary judgment.

### B.    Municipal Liability

Plaintiff alleges that Police Chief Mehaffey and the Township of West Deptford are liable for her injuries because Chief Mehaffey established a practice and custom of inadequately and deficiently investigating citizen complaints of police misconduct.  She contends that this practice protected WDTPD officers from liability for their misconduct, which contributed to causing her harm.  Defendants argue that the WDTPD properly investigated each citizen complaint proffered by Plaintiff, and thus there was no custom of tolerating misconduct.

16

Local government units are not liable under § 1983 solely on a theory of respondeat superior.  See City of Oklahoma City v. Tuttle, 471 U.S. 808, 824 n.8 (1985); Monell v. N.Y. City Dep't of Soc. Servs., 436 U.S. 658, 690-91, 694 (1978) (municipal liability attaches only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury" complained of).  "A defendant in a civil rights action must have personal involvement in the alleged wrongs, liability cannot be predicated solely on the operation of respondeat superior.  Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence."  Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988) (citations omitted).

To establish municipal liability under § 1983, "a plaintiff must show that an official who has the power to make policy is responsible for either the affirmative proclamation of a policy or acquiescence in a well-settled custom."  Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990). A plaintiff must demonstrate that, through its deliberate conduct, the municipality was the moving force behind the plaintiff's injury.  Monell, 436 U.S. at 689.  A policy is made "when a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues a final proclamation, policy or edict."  Kneipp v. Tedder, 95 F.3d 1199, 1212 (3d Cir. 1996) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986) (plurality opinion)).  A custom is an act "that has not been formally approved by an appropriate decisionmaker," but that is "so widespread as to have the force of law."  Bd. of County Comm'rs of Bryan County, Oklahoma v. Brown, 520 U.S. 397, 404 (1997).  Causation may be shown "by demonstrating that policymakers were aware of similar unlawful conduct in the past, but failed to take precautions against future violations, and that this failure, at least in part, led to their injury."  Bielevicz, 915

17

F.2d at 851.

In <u>Beck v. City of Pittsburgh</u>, the Third Circuit addressed the quantum of evidence required for a jury to infer that a municipality has adopted a custom of permitting its police officers to use excessive force in the performance of their duties.  89 F.3d 966, 967 (3d Cir. 1996).  There, the court held that the threshold was satisfied where the plaintiff presented evidence of actual written civilian complaints, which the plaintiff showed were not isolated incidents, and evidence that the City of Pittsburgh had no formal system in place for tracking complaints against its officers.  <u>Id.</u> at 975.  These facts sufficed to create a question for the jury even absent expert testimony.  The <u>Beck</u> court instructed that courts "cannot look to the mere existence of superficial grievance procedures as a guarantee that citizens' constitutional liberties are secure.  Protection of citizens' rights and liberties depends upon the substance of . . . investigatory procedures.  Whether those procedures had substance [is] for the jury's consideration."  <u>Id.</u> at 974.

As evidence of the alleged custom of inadequately and deficiently investigating citizen complaints, Plaintiff proffers six other instances of citizen complaints involving allegations of excessive force from between August 6, 1998 and August 5, 2003.  Using this evidence, Plaintiff demonstrates that WDTPD handled these complaints inconsistently, sometimes performing an Internal Affairs Investigation ("IAI"), other times only generating a cursory "investigative report."  In some cases, the WDTPD neglected to take statements from the accused officers or from those who witnessed the alleged incidents of excessive force.  In one instance, the Annual Use of Force Report to the State, for which Chief Mehaffey is responsible, reported no instances of use of force for a month when WDTPD officers had in fact shot a minor.  Indeed, the evidence

18

produced by Plaintiff reflects that WDTPD does not maintain any records of that particular incident. Many of the investigations did not yield formal findings, but on the summary chart Defendants produced, WDTPD officers are uniformly deemed "exonerated" or the citizen complaint "unfounded."

In further support of the purported custom, Plaintiff highlights similar deficiencies in the investigation of her own allegation of excessive force. See Beck, 89 F.3d at 972 (stating that incidents occurring after plaintiff's experience "may have evidentiary value for a jury's consideration whether the City and policymakers had a pattern of tacitly approving the use of excessive force"). Plaintiff offers evidence to show that the investigation conducted by the WDTPD was an IAI and not simply a fact finding inquiry, as Defendants claim, and it is undisputed that Detective Dobbins, the officer assigned to carry out the investigation, was not trained to conduct IAIs. Dobbins did not interview all available witnesses or Officer McKenna, nor did he notify Officer Goggin that he was the subject of an IAI. Also, the police reports concerning the incident apparently were never reviewed by supervisors, as required. Finally, the investigation was closed without any determination of findings; however, in the annual use of force report submitted to the State, the officers were reported "exonerated."

Moreover, Plaintiff submits the expert opinion of criminologist R. Paul McCauley, which could support a factual finding that the inadequacy of WDTPD's existing practice was so likely to result in violations of constitutional rights, that Chief Mehaffey "can reasonably be said to have been deliberately indifferent to the need." See Natale, 318 F.3d at 584. Specifically, McCauley states the WDTPD "has fallen below the accepted practices of police internal investigatory conduct." (Pl.'s Mot. Summ. J. Ex. O at 21.) For instance, although WDTPD

policies and directives from the Attorney General provided for an analysis of aggregate data, the WDTPD in practice had no policy to detect patterns of officer misconduct.  (<u>Id.</u> at 22.)  He continues that it is highly probable that the reason none of the excessive force complaints were sustained was "a result of the poor quality of the internal affairs investigations rather than a reflection of the officers' actual conduct. . . . [because] when IAIs are poorly conducted they may be biased, intentionally and unintentionally, in favor of the officer  (<u>Id.</u> at 21.)  In support of Plaintiff's contention that WDTPD custom was a proximate cause of her harm, McCauley explains, "If allegations . . . of . . . excessive force are not investigated with rigor and integrity, police misconduct can develop into a culture of police deviance with all its attendant problems. (<u>Id.</u> at 19.)

Like in <u>Beck</u>, a reasonable jury could find here that the grievance procedures used by WDTPD were obviously insufficient to safeguard citizens' constitutional liberties.  As a result, Plaintiff has set forth a triable question as to whether WDTPD and Chief Mehaffey are liable for Plaintiff's excessive force claim.  To the extent that Plaintiff also seeks to hold them liable for Plaintiff's false arrest claim, however, they are entitled to summary judgment, since Plaintiff's evidence is not adequate to support a finding of a practice or custom of condoning false arrests.

**B.     Tort Claims**

Plaintiff alleges that in picking her up and throwing her to the ground, Defendant Officers committed assault and battery under New Jersey law.  Defendants move to dismiss these claims, arguing that the New Jersey Tort Claims Act ("TCA"), N.J. Stat. Ann. § 59:1-1, <u>et</u> <u>seq.</u>, shields Defendant Officers from liability.  Specifically, Defendants argue that section 59:3-3, which states "A public employee is not liable if he acts in good faith in the execution or enforcement of

any law," exempts Defendant Officers from liability.

The TCA immunizes public officials in certain circumstances.  Section 59:3-2 of the TCA provides, in relevant part, that "a public employee is not liable for an injury resulting from the exercise of judgment or discretion vested in him."  N.J. Stat. Ann. § 59:3-2(a).  The TCA further provides that "a public employee is not liable if he acts in good faith in the execution or enforcement of any law."  N.J. Stat. Ann. § 59:3-3.  New Jersey courts define "good faith" in the context of section 59:3-3 to mean objectively reasonable conduct.  Hayes v. Mercer County, 526 A.2d 737, 741 (N.J. Super. Ct. App. Div. 1987).  In many cases, the question of "good faith" presents a question of fact to be resolved at a hearing.  Fielder v. Stonack, 661 A.2d 231, 246 (N.J. 1995).  Summary judgment under section 59:3-3 is appropriate, however, if public employees can establish that they acted in an objectively reasonable manner or that they performed their duties with subjective good faith.  Hayes, 526 A.2d at 741.

The Court finds that Plaintiff has alleged sufficient facts with regard to the assault and battery claims, namely that Defendant Officers acted intentionally and recklessly in taking Plaintiff "to the ground," to prevent the Court from concluding that they performed their duties in an objectively reasonable manner.  This finding does not preclude Defendant Officers from presenting evidence at trial that they acted with subjective good faith so as to receive immunity under the TCA.  This conclusion merely states that Plaintiff has alleged and demonstrated sufficient facts to defeat Defendants' motion for summary judgment as to this issue.

### C.    Punitive Damages

Defendants ask for summary judgment on Plaintiff's claim for punitive damages against Defendant Officers in their individual capacities.  On Plaintiff's § 1983 claims, Plaintiff is

entitled to punitive damages only if she can establish that "the defendants have acted with a 'reckless or callous disregard of, or indifference to, the rights and safety of others.'" Keenan v. City of Phila., 983 F.2d 459, 470-71 (3d Cir. 1992) (quoting Bennis v. Gable, 823 F.2d 723, 734 (3d Cir. 1987)).  The standard of "callous or reckless indifference" is an objective one, inquiring "whether a reasonable officer would have known that his conduct violated a clearly established constitutional right." Russoli v. Salisbury Twp., 126 F. Supp. 2d 821, 873 (M.D. Pa. 2000). With respect to Plaintiff's state law tort claim, punitive damages are available where a defendant acted with "actual malice" or "a wanton and wilful disregard of persons who might be harmed." Cavuoti v. N.J. Transit Corp., 735 A.2d 548, 556 (1999).

Plaintiff presents sufficient evidence from which a jury could find that Defendant Officers acted with a reckless or callous disregard of or indifference to Plaintiffs' rights.  From this evidence a jury could also conclude that Defendant Officers acted with actual malice or a wanton and willful disregard for Plaintiff's safety.  See Kelly v. County of Monmouth, 883 A.2d 411, 419 (N.J. Super. Ct. App. Div. 2005) (stating punitive damages have traditionally been held available upon the commission of a common law assault or battery).  Consequently, Defendants' motion for summary judgment as to Plaintiff's claims for punitive damages will be denied.

## IV.   CONCLUSION

Based on the foregoing reasoning, the Court will grant Defendants' motion for summary judgment in part as to Plaintiff's claim of false arrest against Township of West Deptford and Chief Mehaffey.  The Court will deny Defendants' motion in all other respects.  An accompanying Order shall issue today.

Dated: 4/22/08 _____          _s/ Robert B. Kugler_____
                                          ROBERT B. KUGLER
                                          United States District Judge